673 F.2d 921
 28 Fair Empl.Prac.Cas. 342,
28 Empl. Prac. Dec. P 32,521
Bettie Ethel CLARK, On Behalf of Herself and All Others
Similarly Situated, Plaintiff-Appellant,
v.
CHRYSLER CORPORATION, Defendant-Appellee.
 No. 80-2064.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 5, 1981.
Decided March 5, 1982.
Rehearing Denied April 29, 1982.
 
 Clyde Williams, Jr., Williams, Delaney & Smkin, Richmond, Ind., for plaintiff-appellant.
 Susan B. Tabler, Ice, Miller, Donaido & Ryan, Indianapolis, Ind., for defendant-appellee.
 Before PELL and WOOD, Circuit Judges, and CAMPBELL, Senior District Judge.*
 PELL, Circuit Judge.
 
 
 1
 In January, 1974, Bettie Ethel Clark filed this action, on behalf of herself and all others similarly situated, against Chrysler Corporation in New Castle, Indiana, alleging that Chrysler had discriminated against blacks and females in its recruitment and hiring practices. The allegations of race discrimination were based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (1976), and the Civil Rights Act of 1870, 42 U.S.C. § 1981 (1976). The allegations of sex discrimination were premised on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (1976). In addition, the appellant asserted that Chrysler had violated section 704 of Title VII, 42 U.S.C. § 2000e-3 (1976), by refusing to hire her in retaliation for a charge filed with the Equal Employment Opportunity Commission (EEOC) by Theodore F. Clark, Sr., her husband, on February 8, 1971, and for her charge filed with the EEOC on September 21, 1972. The district court prior to trial conditionally certified two classes based on race, but refused to certify any sex-based class. After a non-jury trial on the merits, the court entered judgment in favor of Chrysler on all issues and decertified the two classes based on race that it had conditionally certified prior to trial. The appellant is appealing from this judgment, primarily raising issues concerning the court's analysis of the statistical evidence presented during the trial.
 
 I. Factual Background
 
 2
 Prior to trial, the appellant sought certification of class actions on behalf of all blacks and females represented by the appellant. The court held a hearing on certification and on March 31, 1976, conditionally certified two classes on the basis of race. The first class, represented by the appellant for claims arising under Title VII, was defined as:
 
 
 3
 All Negroes who, at any time after March 25, 1972, until the present, applied for employment in office or factory positions at the Chrysler Corporation manufacturing plant and offices in New Castle, Indiana, and who have been denied employment by reason of their race.
 
 
 4
 The second class for claimants under section 1981 was defined as:
 
 
 5
 All Negroes who, at any time after September 21, 1966, until the present, applied for employment in office or factory positions at the Chrysler Corporation manufacturing plant and offices in New Castle, Indiana, and who have been denied employment by reason of their race.
 
 
 6
 The class actions were ordered to be maintained under Federal Rule of Civil Procedure 23(b)(2) and (3). The court denied class certification based upon sex on the grounds that the appellant's charge before the EEOC was not a sufficient predicate for a complaint of sex discrimination.
 
 
 7
 On September 10, 1979, the court denied the appellant's motion in limine which sought to exclude any evidence through Chrysler's statistical expert or paralegal witness, as well as any summaries, graphs, or other statistical material prepared but not disclosed to the appellant before trial. On June 16, 1980, the district court adopted Chrysler's amended findings of fact and conclusions of law, entering judgment in favor of Chrysler.
 
 
 8
 The district court found that the appellant had filed applications for employment with Chrysler on May 16, 1972, and June 9, 1973, for unskilled production jobs or office jobs, and on September 7, 1973, for an office job alone. She was never hired by Chrysler. On September 21, 1972, she filed a charge of discrimination with the EEOC. On the front of the charge, the appellant checked the box indicating that the discrimination charged was based on "race or color." A box for discrimination on the basis of sex was not marked. In the narrative portion of her charge, the appellant asserted that "for (3) three years (she had) tried to get a job at Chrysler and they've found ways to avoid (her) applications and hired at least (500) five hundred other women." The EEOC did not investigate her charge or render any findings on the charge. Upon the appellant's request, the EEOC, on or about October 23, 1973, issued to the appellant notice of a right-to-sue.
 
 
 9
 According to the court's findings, the appellant had applied for positions at Chrysler on three occasions, but none of her applications had indicated that she had had prior factory experience or had ever operated factory equipment. Her only background relating to office work was a typing course she had taken in high school prior to 1947, which background was not indicated on her applications. Since 1947, she had had no further experience in using her typing skills. After her last application, which requested only office positions, no office positions were filled by Chrysler.
 
 
 10
 The court heard the individual testimony of twenty-one black witnesses, including the appellant, who had applied for employment with Chrysler. Of these witnesses, the court found that ten were hired, and eleven were not hired. Of the eleven not hired, two applied for jobs not within the scope of the lawsuit. One witness according to the court, did not appear in the applicant log or on any application. Of the remaining eight witnesses, four had applied for office work in September or October of 1973 when Chrysler was not hiring for office positions. None of the applicants seeking production jobs had had prior experience operating factory machinery according to their applications. The only remaining applicant had indicated on his first application that he had received a bad conduct discharge from the Navy, but did not so indicate on his second application. There was no evidence on the record that any white employee with a bad conduct discharge had ever been hired by Chrysler. Moreover, of the twenty-one witnesses, many of them had black relatives who had been hired. With respect to the appellant, her husband had worked for Chrysler for thirty years prior to his death. Her son and two daughters were also hired by Chrysler, with the two daughters having been hired in 1972 and 1973 during the period of the appellant's applications and EEOC charge.
 
 
 11
 Based on these factual findings and the statistical findings summarized below, the court concluded that the appellant had failed to prove by a preponderance of the evidence that the defendant's recruiting and hiring practices had a disparate impact upon blacks. In so concluding, the court reasoned: (1) that a comparison of applicants to persons hired indicated that blacks were hired for production and office jobs in a proportion greater than their representation in the applicant pool; and (2) that a comparison of the persons hired for office and production jobs within the relevant labor market indicated that blacks were hired in a proportion greater than their representation within the relevant labor market. The court also held that the appellant had failed to prove by a preponderance of the evidence that Chrysler had recruited or hired with a motive to discriminate against blacks. Of the twenty-one witnesses presented by the appellant it found that the "probative and credible evidence" indicated that each was not hired for legitimate reasons unrelated to race: "e.g., lack of qualifications for the positions sought, lack of openings for the positions sought, special circumstances-such as pregnancy[1] or 'bad conduct discharge'-which precluded hiring, and random chance." Similarly, the court concluded that the appellant had failed to prove by a preponderance of the evidence that she had not been hired for reasons related to her race or that she had not been hired in retaliation for filing of her charge with the EEOC. The court then decertified the conditional certification of the two classes it had conditionally certified prior to trial, for failure to satisfy the numerosity requirement of Federal Rule 23 of the Federal Rules of Civil Procedure.
 
 II. The Statistical Findings
 
 12
 To recruit applicants for office and unskilled production jobs, Chrysler utilized referrals through the New Castle office of the Indiana Employment Security Division (IESD) and the posting of a sign above the plant door indicating that applications were being taken for positions. From 1966 to 1977, according to the court, the percentage of black employees in Chrysler's New Castle workforce in both unskilled production and office jobs was as follows:
 
 
 13
 Year Percentage Black Employment
---- ---------------------------
1966 1.82%
1967 1.71%
1968 1.68%
1969 1.72%
1970 1.81%
1971 2.09%
1972 2.08%
1973 2.59%
1974 2.55%
1975 2.42%
1976 2.88%
1977 2.91%
 
 
 14
 No significant hiring occurred during the years 1966 through 1970. Moreover, no data exists indicating the racial composition of the applicant pool or the racial designation of persons hired during that period.
 
 
 15
 According to the court, hiring at the facility occurred primarily in three separate periods: (1) late 1971-1972; (2) 1973; and (3) 1976. The court made the following findings of hiring statistics for these three periods:
 
 
 16
 1971-72 1973 1976
 ------- ---- ----
Number of applications 1,688 1,812 725
Number of person hired 704 734 583
Number of black applicants 34 44 * 40
Number of blacks
 hired 29 24 33
Percentage of blacks
 in the total applicants 2.01% 4.82% 5.05%
Percentage of blacks
 in the total hirees 4.12% 9.84% 5.07%
Percentage of blacks
 applicants hired 87.29% 54.55% 82.5%
Percentage of white
 applicants hired 40.83% 25.32% 80.3%
* On June 9, 1973, a total of 889 applications were filed; however, through
 oversighht, the racial designations of the applicants on this date were not
 noted in the applicant log. The statistics on the race of applicants and
 hirees are based on the remaining 913 applications filed in 1973. It was
 known that during the entire year, including the June 9 applicants, a total
 of 45 blacks were hired.
 
 
 17
 During the entire period from 1971 to 1976, only 19 persons were hired for office positions. In 1971, no office workers were hired; in 1972, 11 office workers were hired; in 1973, 8 persons were hired for office positions. From August, 1973, through May, 1977, no persons were hired for any office or clerical positions. The court also found that, during all relevant time periods, Chrysler's criterion for hiring was that the "best qualified" were to be chosen based upon prior experience. With respect to production jobs, Chrysler sought persons with prior factory experience and, particularly, experience in operating factory equipment.
 
 
 18
 The court acknowledged analyses of employee residences conducted in 1973 and 1978, showing that the defendant's workforce was derived from the following counties in the following percentages:
 
 
 19
 Percentage of the Workforce
County From the County
-------- ---------------------------
Henry 87.66%
Delaware 4.24%
Wayne 2.79%
Hancock 2.40%
Madison 1.03%
Rush .90%
Randolph .43%
Marion .17%
Fayette .13%
Franklin .04%
Union .04%
Other .17%
 
 
 20
 The data set forth in the United States Bureau of Census Report for 1970, which the parties had agreed was applicable, indicate the following black populations in the labor forces for the above counties:
 
 
 21
 Minority Percentage of Labor
County Force in the County
-------- ----------------------------
Henry ( .966%)[2]
Delaware 4.85%
Wayne 4.69%
Hancock Too small to measure
Madison 4.19%
Rush Too small to measure
Randolph Too small to measure
Marion 15.95%
Fayette 2.55%
Franklin Too small to measure
Union Too small to measure
 
 
 22
 Thus, approximately 87% of Chrysler's workforce had come from Henry County, in which New Castle is located, which has a black labor force of less than 1%. An additional 12% of Chrysler's workforce came from the seven contiguous counties surrounding Henry County: Delaware, Wayne, Hancock, Madison, Rush, Randolph, and Fayette counties. The remaining hirees, less than 1/2% of Chrysler's workforce, came from non-contiguous counties.
 
 
 23
 The district court's finding with regard to one of the critical issues on appeal, the percentage of blacks in Chrysler's "relevant labor market," was somewhat convoluted:
 
 
 24
 The Black representation in Defendant's labor market, measured by weighing the Black representation in the respective counties in accordance with the representation of each county in Defendant's workforce, yields an availability figure of (1.257)[3] percent for Blacks in Defendant's relevant labor market. Plaintiff's expert witness concluded that, based upon the actual commuting patterns in effect, Defendant's relevant labor market contained a 1.44 percent Black population. In addition, at all times relevant herein, the maximum availability figure for Defendant's relevant labor market utilized by the Office of Federal Contracts Compliance Programs in measuring Defendant's affirmative-action obligations under Executive Order 11246 was 1.8 percent.
 
 
 25
 We read the district court's finding on the black population percentage for Chrysler's labor market as being 1.257%, even though the court's language might be taken to have endorsed a range of percentages anywhere from 1.257% to 1.8%. As explained in our discussion of the court's ultimate finding that Chrysler was not guilty of any violation of Title VII, the ambiguity in determining the precise figure or figures relied upon by the court does not undercut the validity of its ultimate decision.
 
 III. Preliminary Evidentiary Issues
 
 26
 During the trial, the court admitted several summaries prepared by Chrysler of the hiring and application activity at Chrysler. Each of these summaries was, to some extent, based on information contained in the original applications and applicant log. The original applications and the applicant log were also independently admitted. The appellant objects to the manner in which the summaries were prepared, and to the incompleteness of some of the applications and the applicant log. The appellant's objections are not persuasive. Because the underlying applications and log were admitted, admission of the exhibits was not necessary to sustain the court's findings. To the extent that the appellant objects to the incompleteness of these applications and the applicant log, this data was the only primary data available on the applicants and is the data upon which the appellant also relied in part in making her analyses. Neither the absence of evidence on the race of applicants until April, 1971, nor the absence of evidence of the race of 899 applicants on June 9, 1973, nor the absence of evidence of the exact date of hire for the applicants render the sample upon which the court's findings were based so unrepresentative or unreliable as to warrant reversal of the court's findings. See, e.g., Jones v. New York City Human Resources Administration, 528 F.2d 696 (2d Cir.), cert. denied, 429 U.S. 825, 97 S.Ct. 80, 50 L.Ed.2d 88 (1976).
 
 
 27
 The appellant also objects to the admission of data from Chrysler beyond 1973 because the suit was filed in 1974. Data after 1973 represented only a minor portion of the voluminous evidence presented in the trial. Further, as demonstrated in our analysis of the court's ultimate finding, even excluding all data beyond 1973, the appellant's statistical showing failed to demonstrate a significant or substantial disparate impact.
 
 
 28
 IV. The Court's Finding of No Disparate Impact
 
 
 29
 The crux of the appellant's appeal, therefore, is her objection to the district court's ultimate finding that the challenged practices had no disparate impact on blacks. It is the plaintiff's burden under Title VII to demonstrate discrimination by the preponderance of the evidence. Furnco Construction Corporation v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Title VII "does not require the employer to restructure his employment practices to maximize the number of minorities and women hired." Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 259, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981); Furnco Construction Corporation v. Waters, 438 U.S. 567, 577-78, 98 S.Ct. 2943, 2949-2950, 57 L.Ed.2d 957 (1978). In the use of statistical evidence to demonstrate the disparate impact of an allegedly discriminatory practice, the statistical disparity demonstrated must be "significant" or "substantial." Hazelwood School District v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1976); Solo Cup Co. v. Federal Insurance Co., 619 F.2d 1178 (7th Cir.), cert. denied, 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980); see generally, III Larson, Employment Discrimination § 74.59 (1981). We find that the district court was correct in finding that the appellant failed to demonstrate a significant or substantial statistical disparity.
 
 
 30
 The district court found that the recruiting practices employed by Chrysler consisted of referrals through the Henry County IESD and the posting of a notice of available positions at the gate of the plant. The appellant claims that Chrysler's practices had a disparate impact on blacks because: (1) the use of word-of-mouth to publicize available positions through Chrysler's predominantly white workforce tended to exclude blacks; (2) the use of referrals through only the Henry County IESD tended to exclude unemployed blacks from other counties which had larger black populations within the relevant labor market; and (3) the eventual termination of referrals from the Henry County IESD restricted the opportunity of blacks within Henry County from being apprised of job openings at Chrysler's New Castle plant.
 
 
 31
 The district court concluded that none of Chrysler's practices had a disparate impact on blacks because: (1) a comparison of applicants to persons hired indicated that blacks were hired for production and office jobs in a proportion greater then their representation in the applicant pool; and (2) a comparison of the persons hired for office and production jobs with the relevant labor market indicated that blacks were hired in a proportion greater than their representation within the relevant labor markets.
 
 
 32
 With regard to the first comparison utilized by the district court, the data compiled at trial amply supports the court's conclusion of no disparate impact, no matter how the statistical comparison is made. If the percentage of blacks in the total hirees is compared to the percentage of blacks in the total applicants, under the model suggested in Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) and United States v. City of Chicago, 549 F.2d 415 (7th Cir. 1977), blacks were hired in a percentage exceeding the percentage of blacks who applied to Chrysler in 1971-1972 (4.12% to 2.01%), 1973 (9.84% to 4.82%), and in 1976 (5.07% to 5.05%). Moreover, using the data available on the race of applicants and hirees, from 1966 up to and including 1976, 3.55% of all applicants were black, and 5.29% of all hirees were black. Even if the figures for 1976 are excluded, approximately 3.0% of all applicants were black and 5.15% of all hirees were black. Further, if the percentage of black applicants hired is compared to the percentage of white applicants hired, black applicants were hired in percentages exceeding that for white applicants in 1971-1972 (87.29% to 40.83%), in 1973 (54.55% to 25.32%), and in 1976 (82.5% to 80.3%).
 
 
 33
 The second comparison made by the district court followed the model set forth in Hazelwood School District v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Under Hazelwood, disparate impact is measured by comparing the percentage of black hirees in all hirees to the percentage of blacks available in the relevant labor market. The Hazelwood approach is valuable because it is probative of both an employer's actual hiring practices and its recruitment practices. Applying Hazelwood is sometimes problematic, however, because of the difficulty of defining the "relevant labor market."
 
 
 34
 In this case the focal point of contention during the trial was the statistical computation of the availability of blacks in Chrysler's relevant labor market. The appellant's witness, Dr. Morton Marcus, concluded that the percentage of blacks available in the relevant labor market was 3.23%.[4] In making this analysis, Dr. Marcus defined the relevant labor market as including the seven counties contiguous to Henry County, that is, Delaware, Wayne, Hancock, Madison, Rush, Randolph, and Fayette counties, and simply compared the combined black workforce population of those eight counties to the total combined workforce population of these eight counties to determine the percentage of blacks available.
 
 
 35
 Dr. Seymour Wolfbein, Chrysler's expert witness, used a different methodology to compute the availability of blacks within what he determined to be the relevant labor market. After determining the black workforce population within each county from which Chrysler drew its employees, including Marion County, Dr. Wolfbein "weighted" these figures by factors reflecting the percentage of workers in Chrysler's workforce from each county, with a resultant availability figure of 1.257%. A witness from the OFCC, called by the appellant, testified that the OFCC, in conjunction with Chrysler in 1973, had agreed on a goal for black representation in Chrysler's workforce. From the evidence in the record, it appears that the OFCC and Chrysler had agreed to a goal of 1.8% blacks in Chrysler's workforce. This figure was apparently based on the three-county labor market of Henry, Delaware, and Wayne counties and, in some manner, weighted by the percentages of workers in Chrysler's workforce from these counties. Dr. Marcus conceded that his computations of an availability figure, if adjusted to reflect actual commuting patterns to Henry County, would yield an availability figure of only 1.44%, based also on the three-county labor market of Henry, Delaware and Wayne counties.[5]
 
 
 36
 In rejecting the 3.23% figure offered by the appellant and instead accepting a figure in the 1.257% to 1.8% range, the district court implicitly accepted the validity of weighting the percentages of black population from the various counties encompassed by Chrysler's labor market to reflect in some manner the percentage of Chrysler's workforce that had been drawn from each county. It is on the basis of this statistical weighting that the appellant objects to the district court's finding on the availability of blacks within the labor market.[6]
 
 
 37
 The apparent rationale of the weighting methodology is that it "fine tunes" the statistical data to more realistically reflect an employer's actual labor market. In the case of an employer that traditionally draws employees primarily from the county in which it is located, but that has also drawn a small percentage of employees from peripheral areas, it may be more accurate to weight workforce availability statistics to reflect primarily the demographics of the closer geographic areas from which most employees are actually taken.
 
 
 38
 The Supreme Court has recognized the validity of comparing the workforce to the "composition of the population in the community from which employees are hired," United States v. Teamsters, 431 U.S. 324, 337, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977), and has indicated that the relevant labor market should include only those areas from which employees are actually drawn. Hazelwood School District v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). The danger of weighting, of course, is that geographic recruiting and employment patterns may themselves be tainted by racial discrimination. The appropriateness of determining the relevant labor market by the actual composition of an employer's workforce or applicant pool has been questioned when recruitment practices are themselves challenged as discriminatory. See, e.g., Dothard v. Rawlinson, 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977); Markey v. Tenneco Oil Co., 635 F.2d 497, 501 (5th Cir. 1981); United States v. County of Fairfax, 629 F.2d 932, 940 n.9 (4th Cir. 1980), cert. denied, 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981).
 
 
 39
 In this case we are convinced that the district court was correct in accepting those statistics that took account of the actual percentage of Chrysler's workforce from the various counties within its labor market. It is significant that Mr. Hood from the OFCC testified that his office also analyzed the workforce of an employer to determine the relevant labor market and, as noted previously, the figure upon which the OFCC and Chrysler agreed in 1973 was itself weighted in some manner.
 
 
 40
 Further, on the facts of this case, the appellant completely failed to demonstrate that Chrysler's recruiting practices were tainted by discriminatory impact. Returning to the Hazelwood model utilized by the district court, the percentage of blacks in the total number of Chrysler hirees exceeded their availability in the relevant labor market regardless of whether the figure of 1.257% or 3.23% is used. The percentage of blacks in the total hirees was 4.12% for 1971-1972, 9.84% for 1973, and 5.07% in 1976.
 
 
 41
 Moreover, if the total percentage of black applicants is compared to their percentage in the relevant labor market, as set forth in United States v. County of Fairfax, 629 F.2d 932 (4th Cir. 1980), cert. denied, 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981), the percentage of blacks in Chrysler's applicants was 2.01% in 1971-1972, 4.82% in 1973, and 5.05% in 1976. If the district court's finding of a 1.257% availability figure is used, the percentage of black applicants always exceeded their availability. Even if the 3.23% figure is used, the only period of statistical disparity is for 1971-1972, and that disparity is insignificant in the context of the other figures.
 
 
 42
 Finally, the appellant urges that the percentage of blacks in Chrysler's workforce should be compared to the percentage of blacks available in the relevant labor market as was done in Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Using the 1.257% availability figure and going back as far as 1966 to examine Chrysler's workforce, the percentage of blacks in Chrysler's workforce always exceeded their availability in the relevant labor market. Using the appellant's 3.23% availability figure, the percentage of blacks in Chrysler's workforce was never more than 1.38% below this availability figure. Moreover, since 1966, the percentage of blacks in Chrysler's workforce has steadily increased to the point that in 1974 when this suit was filed the percentage of blacks in Chrysler's workforce had risen to 2.55%.
 
 
 43
 In sum, the appellant failed to demonstrate a significant or substantial statistical disparity. Having failed to demonstrate the alleged disparate impact of Chrysler's challenged practices under Title VII, a fortiori the appellant has failed to establish a violation of section 1981. See Washington v. Davis, 426 U.S. 229, 238-39, 96 S.Ct. 2040, 2046-2047, 48 L.Ed.2d 597 (1976); United States v. City of Chicago, 549 F.2d 415, 435 (7th Cir. 1977).
 
 V. The Individual Claims of Discrimination
 
 44
 Despite having failed to establish classwide discrimination, the appellant nevertheless urges that the district court should have found discrimination against each of the individual witnesses and accorded them relief. This argument is without merit. If this action is deemed an individual lawsuit, only named parties are entitled to relief once discrimination is shown. If this action is deemed a class action, no class member is entitled to relief unless classwide discrimination is demonstrated. Teamsters v. United States, 431 U.S. 324, 361, 97 S.Ct. 1843, 1867, 52 L.Ed.2d 396 (1977); Dickerson v. United States Steel Corporation, 582 F.2d 827 (3d Cir. 1978).
 
 
 45
 The only named plaintiff in this action is Bettie Ethel Clark. Despite the failure of the class claims, she would be entitled to relief if she successfully demonstrated that she was individually discriminated against by Chrysler in its hiring or application procedures. To establish a prima facie case of disparate treatment under Title VII, she had to establish: (1) that she belongs to a racial minority; (2) that she applied for and was qualified for the job for which the employer was seeking applicants; (3) that, despite her qualifications, she was rejected; and (4) that after her rejection, the position remained open and the employer continued to seek applications from persons of her qualifications. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Solo Cup Co. v. Federal Insurance Co., 619 F.2d 1178 (7th Cir.), cert. denied, 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980).
 
 
 46
 The appellant does not contest the finding that no office positions were filled during the active pendency of her third application for an office job. It is unrefuted that none of the appellant's applications indicated that she had any prior experience operating factory equipment. The district court found that in its hiring at the times in question, Chrysler was seeking only experienced operators. A plaintiff may fail to establish a prima facie case by failing to demonstrate qualifications or experience for an unskilled position when such qualifications or experience are consistently sought by the employer. Holder v. Old Ben Coal Co., 618 F.2d 1198 (7th Cir. 1980). The appellant, nevertheless, asserts that the finding that Chrysler sought to hire the best qualified individuals based on prior experience is refuted by the job applications in evidence and the qualifications of the witnesses. We fail to see evidence in either the applications or the qualifications of the witnesses that would render the finding clearly erroneous. Given these factual findings, the appellant clearly failed to establish a prima facie case of discrimination.
 
 
 47
 Regarding the appellant's claim that Chrysler retaliated against her for the filing of her EEOC charge and for her husband's filing of a similar charge with the EEOC on February 8, 1971, the appellant has failed to point out any evidence in the record that Chrysler even knew about the appellant's filing of her charge at the time of her applications. Chrysler's "Notice of Charge of Employment Discrimination" on November 28, 1972, did not identify the person who had filed the charge. The district court found that the EEOC had never conducted any investigation of the charge. Moreover, even if we assume arguendo that a claim of retaliation could be based on retaliation against one person for a charge filed by someone else, the appellant failed to establish that she was not hired in retaliation for the charge filed by her husband. As noted above, the district court found that she was not qualified for the positions sought in production and that no persons were hired for office jobs during the pendency of her third application. Also, two of her children were hired by Chrysler in 1972 and 1973, and her husband continued to work for Chrysler until his death in 1976. Finally, her first application occurred 15 months after her husband's charge, with the second application occurring 28 months thereafter and the third application occurring 31 months later. The time lapse of two years between the filing of a charge and the allegedly retaliatory action is sufficient on these facts to negate any possible inference of retaliatory motive. See, e.g., Ekanem v. Health & Hospital Corporation, 589 F.2d 316 (7th Cir. 1978) (per curiam).
 
 
 48
 VI. The District Court's Decertification of the Classes Based on Race and Its Refusal to Certify a Class Based on Sex
 
 
 49
 Because we have concluded the appellant failed to establish classwide discrimination on the basis of race, we need not address the numerous objections addressed by the appellant to the court's eventual decertification of the two classes based on race. Nevertheless, it is appropriate to address the appellant's contention that the district court erred in its refusal to certify a class based on sex. In refusing certification, the district court relied on Jenkins v. Blue Cross Hospital Insurance Co., 522 F.2d 1235 (7th Cir. 1975), in which this court concluded that the charge upon which that complaint was predicated did not form a proper basis for a complaint of sex discrimination. After a rehearing en banc, the court concluded that a statement in the narrative portion of the charge sufficiently alleged sex discrimination to support claims of sex discrimination in the subsequent complaint although only the box designated "race or color" on the charge had been marked. Jenkins v. Blue Cross Hospital Insurance Co., 538 F.2d 164 (7th Cir.), cert. denied, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976).
 
 
 50
 In the present charge, however, only the box designated "race or color" is marked and there is nothing in the narrative portion of the charge to justify an inference of sex discrimination. Indeed, the narrative portion negated any inference of sex discrimination by stating that Chrysler had hired "at least 500 other women" during the three years that Bettie Ethel Clark had applied for positions. Movement for Opportunity and Equality v. General Motors, 622 F.2d 1235, 1253 (7th Cir. 1980). Nor did the EEOC conduct any investigation of the charge. Therefore, allegations of sex discrimination in this case cannot be based upon the parameters of an EEOC investigation of the charge. Belcher v. Bassett Furniture Industries, Inc., 376 F.Supp. 593 (W.D.Va.1974). Under these circumstances, the district court was correct in concluding that Bettie Ethel Clark's charge could not be used as the basis for allegations of sex discrimination and, therefore, there was no basis for certification of a class based on sex.
 
 
 51
 Alternatively, the appellant claims that the charge filed by the appellant's husband "on her behalf" is sufficient to raise the issue of sex discrimination for purposes of the present complaint. Mr. Clark's charge was investigated by the EEOC and that investigation arguably did include investigation of sex discrimination. The matters raised in the charge and investigation, however, have been independently litigated. The notice of a right-to-sue upon which this action is based referred only to the appellant's charge. Ordinarily the jurisdictional prerequisites of Title VII must be "measured against the named plaintiffs regardless of whether the plaintiffs purport to represent a class or not." Belcher v. Bassett Furniture Industries, Inc., 376 F.Supp. at 597 (W.D.Va.1974). Although the appellant's charge indicates that she had filed a previous charge "through (her) husband" on approximately April 12, 1971, nothing on Ted Clark's February 8, 1971 charge indicates that the charge was filed on anyone's behalf but his own. Therefore, we need not address if and when a charge filed on behalf of another party may satisfy the jurisdictional prerequisites for that party's lawsuit, as Mr. Clark's charge was not filed and apparently did not proceed on his wife's behalf. The district court, therefore, was correct in concluding that the charge upon which this action is based did not sufficiently allege sex discrimination for purposes of the complaint and that there was no basis for class certification based on sex.
 
 
 52
 We need not address the appellant's argument that the district court should have certified a subclass of black females because it does not appear that the appellant ever sought to raise the issue of certification of such a specific class in the district court. Young v. Brashears, 560 F.2d 1337 (7th Cir. 1977).
 
 The decision of the district court is
 
 53
 AFFIRMED.
 
 
 
 *
 The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation
 
 
 [1]
 In 1973, the appellee had a policy precluding the hiring of pregnant women. During the physical examination for one witness's application, it was discovered that she was pregnant. She was told to contact the appellee after the baby was born. She did so, and was hired
 
 
 [2]
 The 1.966% figure in the findings is a typographical error
 
 
 [3]
 The 1.227% figure in the findings is, according to Chrysler, a typographical error. From the transcript of the trial it appears that the court intended to adopt Dr. Wolfbein's availability figure. Dr. Wolfbein, weighting the black population from all counties from which Chrysler drew its workforce, including Marion county, testified that the availability figure was approximately 1.3%. One of Chrysler's exhibits which roughly follows Dr. Wolfbein's methodology contains the figure of 1.257%. For purposes of consistency in this opinion, we will refer to Dr. Wolfbein's availability figure at 1.257% as the precise figure has no effect on the merits of this appeal
 
 
 [4]
 Although other availability figures were advanced by Dr. Marcus, it is the 3.23% figure which is propounded by the appellant in this appeal
 
 
 [5]
 Dr. Marcus computed that the total number of blacks employed in Henry County was 1.44% of the total number of employees in Henry County. All of the blacks employed in Henry County, according to his figures, came from Henry, Delaware or Wayne counties
 
 
 [6]
 The appellant urges that Flowers v. Crouch-Walker Corp., 552 F.2d 1277 (7th Cir. 1977), mandates a broad scope of review of factual findings within the clearly erroneous standard because the district court adopted Chrysler's findings. We do not agree that this case presents the same factors which in Flowers justified such review