724 F.Supp. 558 (1989)
Robert L. CRADER, Plaintiff,
v.
CONCORDIA COLLEGE, Defendant.
No. 88 C 9527.
United States District Court, N.D. Illinois, E.D.
September 27, 1989.
*559 *560 Armand L. Andry, Oak Park, Ill., for plaintiff.
John A. McDonald, Laurie A. Spieler, Keck, Mahin & Cate, Chicago, Ill., for defendant.

MEMORANDUM OPINION AND ORDER
SHADUR, District Judge.
Robert L. Crader ("Crader") sues his former employer Concordia College ("Concordia"), charging:
1. Concordia denied him a promotion and disciplined, harassed and discharged him, all on the basis of his race,[1] in violation of 42 U.S.C. § 1981 ("Section 1981") (Count I) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII") (Count II).
2. Concordia placed additional burdens on him, gave him negative evaluations, denied him a promotion and discharged him in retaliation (a) for his testimony on behalf of a co-worker in a race discrimination case before the Illinois Department of Human Rights ("IDHR")[2] and (b) for his own filing with IDHR of a discrimination complaint against Concordia[3] (Count III).
Concordia has now moved under Fed.R. Civ.P. ("Rule") 56 for summary judgment on all of Crader's claims. For the reasons stated in this memorandum opinion and order, the motion is granted as to Count I and in part as to Count III, but is denied in all other respects.

Facts[4]
Concordia is an undergraduate and graduate college operated by the Lutheran Church-Missouri Synod and located in River Forest, Illinois. It hired Crader as an entry level laborer in its Housekeeping Department ("Department") on October 15, 1979. Department maintains, cleans, supplies and services the campus buildings and all the college facilities, for which purposes it employs both full-time non-student workers and part-time student workers (Spurgat Aff. ¶ 7). At all times relevant to this litigation until 1987, Department's personnel occupied a hierarchical structure comprising, in descending order of rank, a Director, an Assistant Director, supervisors, crew leaders and laborers.
When he was hired Crader was assigned a step 3, grade 1 laborer position. In 1980 he was promoted from laborer to crew leader; in 1981, from crew leader to supervisor; and in 1982 or 1983, from supervisor to Assistant Director of Housekeeping, a step 8, grade 7 position (Shackel Aff. ¶¶ 3, 4, 5, 6). Twice during those years Director of Housekeeping David Allor ("Allor") filled out written evaluations of Crader's work. In 1981 Crader received 5s ("Excels in every situation relevant to this factor") on a 5-point rating scale in each of the 14 categories evaluated. Then in 1982 Crader received an overall rating of "outstanding" and, in the specific categories, received nine 5s, four 4s ("Has demonstrated ability to a degree that is clearly above that expected for competence") and one "N/A" *561 ("not applicable") in written communications. Concordia stopped using those evaluation forms in about 1984 (Hermann Dep. 40-45).
Late in 1984 Elsie Rhodes ("Rhodes"), another black housekeeping employee, filed a race discrimination complaint with IDHR. After Crader testified on her behalf in the IDHR hearing, he had several "run-ins" with Allor (Crader Dep. 150). And shortly after the Rhodes hearing Dean of Administration Dr. Fred Spurgat ("Spurgat") told Crader he did not care for the way things went at the hearing (id. 162).
During his employment up to 1987 Crader repeatedly heard Concordia's Operations Manager Neal Shackel ("Shackel") make racial and ethnic jokes (Crader Dep. 126-30). Crader also testified to two racist statements by his direct supervisor Allor:
1. Allor once told Crader he was expendable because "I can get another nigger" (id. 164).
2. In 1984 Allor told Personnel Director Elaine Hermann ("Hermann") that he needed to fill a position in housekeeping but she should not send another black because they didn't seem to work out.
As to that second remark, Hermann thought it a joke and Allor received no reprimand or discipline of any kind (Hermann Dep. 43-44).
In his job as Assistant Director of Housekeeping, Crader's many duties and responsibilities included, in part,[5] regularly supervising student workers and workers on the evening shift, overseeing floor maintenance and helping with the development of the budget (Shackel Aff. ¶ 8). Crader would also assume the duties of the Director, including payroll calculations, whenever Allor missed work (Crader Dep. 44-47). Concordia identifies one aspect of Crader's performance as problematic: After Crader once filed an unfavorable report as to housekeeping supervisor Jean Smith, she complained to Allor. Allor then instructed Crader he should no longer inspect her work area (id.).
On November 13, 1987 Allor resigned as Director of Housekeeping and left Concordia's employ. At that point the trouble really began. Crader believed, in light of his seniority and good record, that he should have been named Director in Allor's place (Crader Dep. 274). But Operations Manager Shackel disagreed because he believed Crader did not have the basic mathematical skills required for the job. Moreover, Allor had told Shackel that Crader had not demonstrated a track record of follow-up supervision and of being on site when a crew is at work (Shackel Dep. 22).
Though Shackel nevertheless considered Crader along with Jean Smith ("Smith") and Frank Airhart ("Airhart") (two of Crader's inferiors in Department's supervisory structure) as the best management people then available within Department, he says he believed none of them had the overall ability to be Director. Shackel had been specifically instructed not to look outside the College staff for Allor's replacement. He therefore decided to reorganize Department's supervisory structure by eliminating the Director and Assistant Director positions and replacing them with three Associate Directors, each of whom would have individual responsibility for certain areas while they would coordinate Department's overall supervision (Shackel Dep. 13-14; Hermann Dep. 28-29).
Before implementing that change Shackel sought input and suggestions from Crader, Smith and Airhart. Crader told Shackel (1) he questioned the workability of the reorganization, (2) he believed he was getting "the shaft" and (3) he felt Shackel was trying to get rid of him (Crader Dep. 276-77). Nonetheless Crader told Shackel he had resigned himself to the facts that reorganization would take place and that if he was dissatisfied he could always quit (id. 275). Shackel asked Crader not to quit but to accept an Associate Directorship (id. 292).
Shackel received approval of the plan from his superiors, Personnel Director Hermann, Dean of Administration Spurgat and Concordia's President Dr. Eugene Krentz *562 (Hermann Dep. 29). Shackel then began to implement the plan by offering Smith an Associate Directorship in charge of the a.m. shift, Airhart an Associate Directorship in charge of the p.m. shift and Crader an Associate Directorship in charge of the floors. In November 1987 both Smith and Airhart accepted the offers, which represented a promotion (including a raise) for each of them. Crader, however, initially declined the offer because he felt it represented not a promotion but a diminution of his responsibility (Crader Dep. 275, 292; Shackel Dep. 46-71 explains the respective duties of the three new positions).
Crader then filed a grievance pursuant to Concordia's procedures, expressing his view that the Director's position should be reinstated and he should fill it (Crader Dep. 284 and Dep. Ex. 10). Concordia considered and denied Crader's request and again encouraged him to accept the Associate Directorship (id. 285, 290). After several weeks of unsuccessful negotiations for a greater pay raise than that originally offered, Crader finally accepted the Associate Director position about December 20, 1987 (Shackel Aff. ¶ 17).
Early 1988 witnessed substantial intra-Departmental turmoil. Crader openly resented the restructuring, and relations between him and Smith became quite strained. Immediately after the restructuring Smith, with Shackel's knowledge and without notice to Crader, moved Crader's desk out of his former office and took that office for herself (Airhart Dep. 39-42; Smith Dep. 10). Then on January 15, 1988 Smith removed some floor runners from Crader's new office space, again without notifying him. When Crader discovered what had happened he told Smith he was "tired of this shit" (Crader Dep. 301-02). Further conflicts between Crader and Smith over scheduling and scope of authority persisted, resulting in reports to Shackel of Crader's refusal to cooperate (Shackel Aff. ¶ 20). Those reports, compounded by Crader's tardiness and absence at regularly scheduled Department meetings, led Shackel and Hermann to write Crader a March 31, 1988 letter placing him on probation (Shackel Aff. ¶ 22) and stating he would be terminated unless his performance improved within 60 days.
About April 26, 1988 Crader filed his already-mentioned IDHR complaint (see n. 3) charging race discrimination and retaliation for his having testified on Rhodes' behalf. On June 3, 1988 Concordia discharged Crader, citing his asserted lack of improvement. Crader then amended his IDHR complaint to include a charge of discrimination and retaliation for having filed his own charges resulting in his discharge.[6]

Count I
As stated at the outset of this opinion, Complaint Count I is grounded entirely on Section 1981. But to the extent the claims there stem from Crader's allegedly race-based harassment, discipline and discharge, they are expressly barred by Patterson v. McLean Credit Union, ___ U.S. ___, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Patterson, id. 109 S.Ct. at 2372 teaches:
Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts.
As to Concordia's allegedly discriminatory failure to promote Crader, however, Patterson does not state the rule in such bright-line terms. Instead it says (id. at 2377):

*563 [T]he question whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable under § 1981. In making this determination, a lower court should give a fair and natural reading to the statutory phrase "the same right ... to make ... contracts," and should not strain in an undue manner the language of § 1981. Only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981.
Although that language is certain to generate substantial litigation before the line is marked out with any precision,[7] it poses no great difficulty here. Patterson, id. followed the quoted language only with a reference to Hishon v. King & Spalding, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1985), which had dealt with a Title VII claim against a law firm refusing to accept an associate into partnership. While a promotion to Director might perhaps have represented a substantial increase in responsibility and authority for Crader (a matter in some dispute between the parties), in any event it would not have fundamentally altered the quality of his relationship with Concordia in any way comparable to the move from associate to partner in a law firm  it would not have "involved the opportunity to enter into a new contract with" Concordia or the "opportunity for a new and distinct relation" in the sense called for by the most reasonable reading of that language in Patterson.[8] Hence Crader's failure-to-promote claim, like all the other Count I claims, falls outside Section 1981's coverage.
In sum, Count I is barred in its entirety. Concordia is entitled to a judgment on all claims embraced in that count.

Count II
Count II is functionally identical to Count I but charges violations of Title VII rather than Section 1981. Because Title VII covers all aspects of employment relations and not just contract formation, the Count II claims are not similarly fore-doomed as a matter of law. This opinion must therefore examine the factual bases of those Crader claims.
For that purpose Crader can avoid summary judgment in either of two ways:
1. by demonstrating the existence of a genuine issue of material fact as to the existence of direct evidence that racial animus motivated Concordia in making the challenged decisions or
2. absent such direct evidence, by showing such a material factual issue at any stage of the familiar ping-pong approach dictated by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25 (1973) as rearticulated in Texas Department of Community *564 Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981).
Both those possibilities will be examined here.
As direct evidence of racial discrimination Crader offers the following:
1. Allor's statement to Crader that he could always get another "nigger";
2. Allor's statement to Hermann not to send any more blacks to Housekeeping "because they didn't seem to work out"; and
3. a series of undefined comments by Shackel that Crader characterized as racist jokes and ethnic slurs.
As the following discussion explains, even though it may be questionable whether those things (either singly or collectively) rise to the level of direct evidence of a racially discriminatory motive in the employment decisionmaking process, final resolution of the issue will have to await trial.
As for Allor's comments, La Montagne v. American Convenience Products, Inc., 750 F.2d 1405, 1412 (7th Cir.1984) teaches a court must ask not only whether someone evinced an intent to discriminate but who that someone was, for only evidence probative of the actual decisionmaker's motives are relevant in this setting. Although Allor had a supervisory role vis-a-vis Crader for a time, he played no role in the decision to restructure Department. In fact it was Allor's departure from Concordia that precipitated (and necessarily preceded) Shackel's decision to abolish the Director's position that Crader had his eye on. However, Allor did report on Crader's performance to Shackel during his tenure as Director, and Shackel ascribed his decision as to Crader's asserted lack of qualifications as Allor's successor at least in part to input received from Allor (Shackel Dep. 22). If that source was in fact polluted by racial bias, that might be enough to poison the well of Shackel's decision even if he were wholly innocent of such a bias on his own part. Though that possibility might arguably be viewed as tenuous (Shackel explained that his decision as to Crader was based on other factors, including his own observation, in addition to Allor's reports on Crader), it seems in order to leave the question to the ultimate factual determination at trial.
As for Shackel himself, because he had primary responsibility for making the challenged decision, any statements by him indicating discriminatory motivation would go to the heart of the issues presented. But Crader's vague reports of Shackel's alleged racial jokes and ethnic slurs do not raise a genuine issue of fact as to racial animus in the decisionmaking process. Crader offers nothing more than his own testimony that, over the course of their acquaintance, he heard Shackel make jokes that led Crader to believe that Shackel had an unconscious and deep rooted prejudice against blacks.
Even accepting that as true, as this Court must in considering this motion, it still does not provide direct evidence that racial bias motivated Shackel in deciding how to organize Department. All the cases that have held an employer's discriminatory statements are enough direct evidence to bar summary judgment have involved statements linking the proscribed animus (either age or race) with the sued-upon employment decision. For example, Stumph v. Thomas & Skinner, Inc., 770 F.2d 93, 97 (7th Cir.1985) found that a single statement by the employer provided direct evidence giving rise to a genuine fact question because that statement (that the company would have to get rid of some of its older employees to make way for a young, aggressive organization, id. at 94) spelled out the discriminatory thought process behind crucial employment decisions. Here Crader offers only a vague report of scattered "racist" jokes but provides no direct evidence to support the conclusion that racial animus motivated the Department's restructuring. Absent the evidence discussed earlier, that would not have been enough to stay in court on a direct-evidence basis.
On the direct-evidence front, then, Crader has shown himself entitled to some limited survival. This opinion turns now to the McDonnell Douglas-Burdine analysis, *565 where Concordia makes two separate but related arguments. Not surprisingly, those arguments attack both stages of the ping-pong sequence during which the ball is on Crader's side of the net.
First Concordia maintains that (1) because of Department's restructuring, the position that Crader sought no longer existed and (2) because the position didn't exist (a) Crader could not have been rejected and (b) no opening existed for which Concordia continued to seek applications. Thus, Concordia reasons, Crader cannot make a McDonnell Douglas prima facie case.
But that reflects an overly crabbed reading of McDonnell Douglas. Burdine, 450 U.S. at 253 n. 6, 101 S.Ct. at 1093-94, n. 6 (not to mention any number of lower court cases applying the doctrine) has made it clear that the McDonnell Douglas prima facie case component is flexible and should be adapted to different fact situations as appropriate. Here the basic thrust of Crader's claim is that Concordia undertook the restructuring to avoid giving him, a black, a promotion for which he was in line. This Court cannot condone the potential subterfuge involved in Concordia's restrictive approach, which would deny Crader an opportunity to prove that a racial animus motivated Concordia's conduct, simply because the effect of that very conduct prevents Crader from making a neatly-ordered McDonnell Douglas showing.
Faced with a similar contention, Dumas v. Town of Mount Vernon, Ala., 612 F.2d 974, 980 (5th Cir.1980) held the abolition of a position to avoid filling it with a qualified black candidate could amount to discrimination despite the fact that no non-minority person received preferential treatment. This Court reaches a parallel conclusion here. It finds Crader has established a prima facie case by showing that (1) a position had been vacated, (2) he was available, anxious and arguably qualified for the position[9] and (3) Concordia abolished the position, replacing it with three lesser positions of shared authority to be filled by Crader and two whites who were formerly his subordinates.
Nor does the fact that Crader received a "promotion" from Assistant Director to Associate Director, including a raise, alter the just-outlined reasoning and conclusion. As suggested earlier, the parties quarrel over whether the change in position actually amounted to an increase in responsibility and authority. And after all, however that factual dispute may be resolved, the Director position would unquestionably have conferred substantially greater responsibility and authority. Again, if Crader were foreclosed from the opportunity to show that the abolition of the Director's position was discriminatory, simply because he received a lesser change in title that he neither sought nor regarded as positive, that would open the door to the use of creative employment devices as a mask for discrimination.
That leads to consideration of Concordia's second-level argument: that it did not promote Crader to Director for the legitimate reason that he was not qualified.[10] On that score Concordia emphasizes that the Director's position required extensive use of basic mathematics skills lacking in Crader. Concordia also maintains Crader had had some supervisory follow-up problems that rendered him ill-equipped for the Directorship. For those reasons as well as the perceived strengths of Airhart, Smith and Crader in different *566 but complementary areas, Concordia opted to restructure Department to make the best use of the available talent.
Such an asserted lack of qualifications, even if insufficient to defeat a Title VII case at the prima facie stage (see n. 10), is certainly enough to meet Concordia's limited burden of production under McDonnell Douglas, moving the case to the last phase of that analysis  the pretext issue (Burdine, 450 U.S. at 254-56, 101 S.Ct. at 1094-95; and see such cases as Herman v. NBC, 744 F.2d 604, 608 (7th Cir.1984)). And it requires only a limited rehearsal of the already-recited evidence to show a genuine issue of fact as to the credibility of Concordia's proffered explanation.
Crader first points to his positive track record at Concordia to raise the necessary doubt in that respect. Until 1987 his performance had received nothing but praise. While written evaluations were not used consistently, each time his superior filled one out it reflected a very high (and on one occasion a perfect) score. And until the restructuring Crader had never been seriously reprimanded for his performance. Crader faults Shackel for his not reviewing the evaluations from Crader's file, instead relying only on Shackel's personal observations in making the promotion decision. That objection cannot carry the day, for a manager may certainly rely on his or her own observations rather than on dated files in making employment decisions. However, the fact that Shackel's procedure was not per se invalid does not eliminate consideration of those evaluations as casting doubt on the veracity of Concordia's explanation.
As for the suggestion that Crader did not have adequate math skills, he responds with evidence that he had  without any problem  assisted the former Director with the budget and payroll tasks requiring such skills.[11] Moreover, he offers evidence that he had assumed all the obligations of being Director on several occasions when Allor had missed work and that no one had questioned his competence in those periods. Surely that showing poses a material factual issue as to whether Concordia's asserted reasons for the restructuring were pretextual.[12]
This situation may profitably be contrasted with such cases as Dale v. Chicago Tribune Co., 724 F.Supp. 537 (N.D.Ill.1985), where this Court and then our Court of Appeals (797 F.2d 458, 464-65 (7th Cir.1986)) found a plaintiff's self-assessment of his own qualifications inadequate to overcome a summary judgment motion. Rather than simply advancing an employee's unsupported perception of himself as was done in Dale ("No man is a just judge in his own cause"), Crader relies on Concordia's positive evaluations of his work and on the uncontroverted evidence of his intermittently having performed the Director's tasks without objection. That evidence, when coupled with Crader's testimony as to racial and ethnic slurs by his superiors, surmounts the threshold described in Stumph, 770 F.2d at 98:
[I]n opposition to a motion for summary judgment a plaintiff should be required to do no more than offer proof which casts doubt upon the veracity of the employer's stated reasons for its action.
Concordia's motion is denied as to Count II's failure-to-promote claim.
On the same count's discriminatory-discharge claim, Concordia again launches a two-level attack:
1. Crader (a) offers no direct evidence of discrimination and (b) fails to make a *567 prima facie McDonnell Douglas-Burdine case because he cannot show his job performance met his employer's legitimate expectations.
2. Concordia has a non-discriminatory explanation for the discharge because Crader did not meet its legitimate expectations of performance.
As suggested in n. 10, those formulations tend to become fused because they rely on the same claims: Crader did not do his job well; he received a warning and a letter placing him on probation; and his performance failed to improve during the probationary period, triggering his discharge.
In support of those claims Concordia adverts to evidence that Crader (1) was uncooperative and abrupt with other Associate Directors (particularly Smith) and with Shackel, (2) skipped a staff meeting without explanation and (3) refused to make schedule changes to accommodate other Associate Directors' needs.[13] Though Crader admits he did not cooperate fully with Smith and Shackel, he says that was a response to their improper behavior toward him: Smith's admitted objection to Crader's supervision when he served as Assistant Director, the admitted Smith-Shackel decision to evict Crader from his office  implemented with no notice to Crader  and Shackel's alleged racial slurs. Crader buttresses that with Airhart's testimony that Crader always cooperated with him (at least creating the inference that Crader was willing to do his job cooperatively with people who didn't try to undermine him). Crader adds that his behavior did not change materially after the probation letter for the simple reason that Smith and Shackel did not treat him any differently than they had previously.[14]
Of course an employee's failure or refusal to cooperate with his or her colleagues and superiors presents a substantial performance problem. But here Crader has raised a serious question whether cooperation was a legitimate expectation in the circumstances. As Moffett v. Gene B. Glick Co., 621 F.Supp. 244, 281 (D.C.Ind. 1985) put it in the context of claimed harassment followed by the employee's failure to respond:
[E]mployers should not be able to make things so miserable for an employee that performance suffers, and then be able to use that which is the employer's fault as a justification for terminating an employee....
Only a trier of fact is qualified to resolve that factual cause-and-effect dispute. Because the issue can plainly go either way, Concordia's summary judgment motion is also denied as to Count II's discriminatory-discharge claim.

Count III
As already stated, Count III claims Concordia's adverse employment decisions were in retaliation for (1) Crader's testimony before IDHR on Rhodes' behalf and (2) his 1988 filing of his own discrimination complaint with IDHR. If true, that presents a viable claim under 42 U.S.C. § 2000e-3(a).
Klein v. Trustees of Indiana University, 766 F.2d 275, 280 (7th Cir.1985) teaches the prima facie showing for such a case comprises:
1. Crader's opposition to an employment practice he reasonably believed was unlawful under Title VII, or his participation in a Title VII proceeding, and
2. Crader's having suffered an adverse action by his employer
3. because of such opposition or participation. *568 Here there is no dispute as to the first two factors, leaving the causation issue as the central point of debate between the parties.
As for the first incident pointed to by Crader  his 1984 testimony on Rhodes' behalf  Concordia contends the essential causal link is missing because of the passage of time between that event and Crader's non-promotion in 1987 and ultimate discharge in 1988. For that purpose Concordia tries to get a bit too much mileage out of Clark v. Chrysler Corp., 673 F.2d 921 (7th Cir.1982), where under very different facts the Court of Appeals said this (id. at 930, citation omitted):
The time lapse of two years between the filing of a charge and the allegedly retaliatory action is sufficient on these facts to negate any possible inference of retaliatory motive.
Accord, Ekanem v. Health & Hospital Corp. of Marion County, 589 F.2d 316, 320 (7th Cir.1978) (per curiam). Concordia seeks to draw from Clark a bright-line rule of law to that effect, glossing over that opinion's "on these facts" qualifying modifier.
Any reading of Clark from a neutral (rather than an advocate's) perspective must recognize that it presented a whole set of factors that render it inapplicable as an all-fours precedent for this case. But it cannot be gainsaid that the same result is called for here, for it is simply not reasonable to infer that Crader's 1984 testimony created a wound that festered for more than two years and then ultimately manifested itself in conduct adverse to Crader only in 1987. Nor does the just-stated conclusion fail to take into account Dean of Administration Spurgat's post-hearing statement to Crader that he did not like the way the hearing had gone. If anything, that comment followed by such an extended period of inaction really tends to negate any notion that the adverse action  when it finally did come in 1987  was in retaliation for the 1984 testimony. In sum, a trier of fact could not reasonably infer the required causal relationship, and any claim based on the earlier EEOC testimony must fail.[15]
But the situation is obviously totally different as to Crader's claim that Concordia discharged him in retaliation for filing his own discrimination charge with IDHR in April 1988. No significant time lapse occurred between that event and Crader's June 3, 1988 firing so as to make the causation showing at all problematic. And of course Crader's already-discussed success in posing a factual question of pretext as to Concordia's proffered explanations creates a genuine issue of material fact for trial. Concordia's motion for judgment as to Count III is therefore denied.

Conclusion
There is no genuine issue of material fact, and Concordia is entitled to a judgment as a matter of law, as to Complaint Count I and as to Crader's claim of retaliation based on his 1984 EEOC testimony. In all other respects Concordia's motion for summary judgment is denied.
NOTES
[1] Crader is black.
[2] That testimony was in IDHR case number 1984 CS-1658.
[3] Crader's complaint was assigned IDHR case number 1988 CN-3619. Crader simultaneously filed charges with the Equal Employment Opportunity Commission ("EEOC"), which issued Crader a right-to-sue letter on August 26, 1988.
[4] Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant  in this case Crader (DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326, 329 (7th Cir.1987)).
[5] In fact, the official job description lists 17 specific duties and responsibilities.
[6] Crader's opposition to Concordia's motion also includes undisputed statistical evidence of minority underrepresentation (indeed, almost total minority nonrepresentation) in various parts of the Concordia organization other than Department. Whatever force those statistics might be thought to have carried until the Supreme Court's recent opinion in Wards Cove Packing Co. v. Antonio, ___ U.S. ___, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), that case has rendered them of no consequence in legal terms. Wards Cove, id. 109 S.Ct. at 2123 specifically addressed the weight of that kind of evidence and concluded "the percentage of non-white workers found in other positions of the employer's labor force is irrelevant."
[7] After this opinion was already written and was in the process of transcription, this Court received (and promptly read), as part of the most recent batch of slip opinions delivered to its chambers, Malhotra v. Cotter & Co., 885 F.2d 1305 (7 Cir.1989) our Court of Appeals' first post-Patterson treatment of a Section 1981-based employment discrimination claim. On the point just stated in the text, Judge Posner wrote for the panel (id. at 1312):

We show no disrespect to the Supreme Court by suggesting that the scope of Patterson is uncertain. The glory of the Anglo-American system of adjudication is that general principles are tested in the crucible of concrete controversies. A court cannot be assumed to address and resolve in the case in which it first lays down a rule every controversy within the semantic reach of the rule.
[8] Accord, Malhotra, 885 F.2d at 1311. Judge Posner also advances (id.) a theoretical alternative reading of the Patterson language quoted in the text of this opinion  a reading that this Court, like Judge Ripple concurring in Malhotra id. at 1317-1318, finds problematic. As that alternative reading would have it, Patterson might be viewed as (1) distinguishing between promotions available only to persons already in the employer's work force and those available both to such present employees and to outside applicants and (2) permitting the latter category of promotional opportunities to survive Patterson as potential Section 1981 claims. But even in those terms Crader would fail the test, because Shackel was not permitted to go outside Concordia's existing personnel to fill the Director's position when Allor left (Shackel Dep. 13-14).
[9] As discussed below, Concordia also contends Crader was not qualified to be Director. But Crader has responded by proffering enough evidence to the contrary to create a genuine and material issue to be decided by a factfinder.
[10] It is necessary to revisit the question of Crader's qualifications here, despite this opinion's previous discussion of the same issue in considering his prima facie case, because the McDonnell Douglas analysis often calls for consideration of the same concerns at both step 1 and step 3. Nellis v. Service Web Offset Corp., 695 F.Supp. 398, 402 (N.D.Ill.1988) is one of a number of cases in which this Court has noted that the employee's prima facie component of showing proper qualification "could be read broadly enough to `telescope' the entire analysis into a one-step McDonnell Douglas ... inquiry." While such a consolidated approach could have been used here, this Court, for clarity's sake, has opted to keep the analysis compartmentalized in the traditional tripartite structure.
[11] Relatedly, Crader says Concordia has grossly exaggerated the nature of the Director's tasks requiring any skill in mathematics. According to Crader, keeping track of payroll, and not extensive budgeting, was the primary mathematical task facing the Director. But what controls in any event is the fact that Crader performed the tasks however they were defined.
[12] This conclusion has been reached without ascribing any weight to another contention made by Crader  one in which he points to Shackel's having appointed Allor to the Director's position, rather than a black man who had formerly been Department's Assistant Director. Even with reasonable pro-Crader inferences, that cannot be viewed as evidencing any ongoing racial bias in promotional decisions. Absent any showing at all as to the relative qualifications of those two individuals, it would be entirely improper to indulge rank speculation on that score.
[13] Those and similar claimed transgressions were delineated in the March 31, 1988 letter from Hermann to Crader placing him on probation.
[14] Crader also argues that the probation letter was itself evidence of racial discrimination. As he points out, any differences between Shackel and Allor during the latter's tenure as Director were worked out without resort to the disciplinary process. That, if true, supports an inference that Shackel treated Crader more harshly than he did white subordinates. Although Crader offers only his own testimony on the point, at this stage it must be credited rather than weighed. And when credited it supports Crader's argument that his own alleged disciplinary problems were more pretextual than real.
[15] No ruling is now made as to the admissibility or nonadmissibility of evidence as to Crader's having given that earlier testimony when, at trial, Crader's still-surviving claims will be dealt with.