Antonio MARFIA, Plaintiff,

v.

T.C. ZIRAAT BANKASI, New York Branch, Defendant,

and

Ozer Ozman, Individually and in his official capacity as General Manager of T.C. Ziraat Bankasi, New York Branch, Defendant.

No. 88 Civ. 3763 (DC).

United States District Court, S.D. New York.

Dec. 27, 1994.

Herbert Eisenberg, Davis & Eisenberg, New York City, for plaintiff.

Laura B. Hoguet, Glenn M. Kurtz, White & Case, New York City, for defendants.

## OPINION

CHIN, District Judge.

Before the Court in this employment discrimination case are (1) White & Case's motion for leave to withdraw as counsel for defendant Ozer Ozman, (2) the parties' cross-motions in limine to exclude certain evidence from trial, and (3) plaintiff's application with respect to the use of Ozman's default at the trial of plaintiff's claims against defendant T.C. Ziraat Bankasi (the "Bank").

### Background

Plaintiff Antonio Marfia is a 52–year old man of Italian descent. He was employed by the Bank at its New York Branch from January 1984 until May 1987, when he was discharged. From September 1985 until his discharge, he worked under the direct supervision of Ozman, a Turkish national who was then stationed in New York as the General Manager of the New York Branch. As General Manager, Ozman was "authorized and empowered in the name and on behalf of the Bank to execute, authorize, and conduct all business matters related to the operations of the New York Branch." (Corrected Consent Pretrial Order, p. A–2). Plaintiff alleges that during his tenure at the Bank, Ozman made a number of statements to him that demonstrated a bias against Italians in particular and "non-traditional Americans" in general.

Plaintiff commenced this action in May 1988, complaining that the Bank and Ozman had discriminated against him because of his age and national origin. The Bank and Ozman, both represented by White & Case, submitted one answer and proceeded to defend the case jointly.

Plaintiff noticed Ozman's deposition for January 13, 1989. Ozman, however, failed to appear, and defendants also failed to produce certain documents. The Bank contends that Ozman had heart surgery a few weeks before the date for which his deposition was scheduled, and that consequently he was too ill to appear. After plaintiff made a motion to compel, the Court (Duffy, J.) ordered defendants to produce certain documents and ordered Ozman to appear for deposition. Defendants' cross-motion for a protective order was denied, and the Court assessed attorneys' fees of $500.

Thereafter, Ozman started his deposition on June 5, 1989, but refused to complete it. Moreover, he apparently destroyed evidence. Plaintiff again moved for sanctions, against both defendants. Judge Duffy entered a default judgment in October 1989, which stated in part as follows:

[I]t is hereby ...

ORDERED, ADJUDGED AND DECREED that defendant Ozer Ozman, individually and in his official capacity as general manager of the bank, has engaged in bad faith conduct. Accordingly, pursuant to Fed.R.Civ.P. 37(b)(2)(C), the court ORDERS that each and every allegation of plaintiff's complaint shall be deemed admitted by defendant Ozer Ozman individually and in his official capacity as general manager of T.C. Ziraat Bankasi, New York Branch, and that plaintiff shall have Judgment against defendant Ozer Ozman, individually, and in his official capacity as general manager of T.C. Ziraat Bankasi, New York Branch, on each and every cause of action in plaintiff's complaint for the relief demanded in the complaint together with interest, costs and reasonable attorney fees.

Ozman was the General Manager of the Bank during the events leading up to the entry of the default judgment against him. The Bank terminated his employment on June 28, 1989, several weeks after he refused to complete his deposition, although it purported to make the termination effective retroactively to March 15, 1989. (Def. Mem. in Opp. to Pl. Proposed Use of Default Judgment at 5–6).

In March 1990, plaintiff moved for summary judgment on his claims against the Bank, relying on the default judgment entered against Ozman. Judge Duffy denied the motion in a memorandum endorsement, the entire text of which is as follows:

The default taken established nothing. There are questions of fact extant. Summary judgment is inappropriate and this motion is denied.

The parties have now filed a consent pre-trial order and the case is otherwise ready for trial of the remaining claims—the claims against the Bank.

## DISCUSSION

### 1. The Motion to Withdraw

█ White & Case's motion for permission to withdraw from representing Ozman is granted.[1] Ozman has refused to cooperate in the defense of this case. He apparently brought two lawsuits against the Bank in Turkey. Not only have his actions and inactions in the present lawsuit resulted in a default judgment against him, he has continued to refuse to cooperate with the Bank and White & Case. His action and inactions have prejudiced the Bank's defense of the case. Ozman's refusal to cooperate is sufficient reason to allow White & Case to withdraw.

Moreover, plaintiff will not be prejudiced by White & Case's withdrawal. Trial of this case will not be delayed, as a default judgment has been entered against Ozman and he would not be permitted to defend himself at trial in any event. Although the amount of damages to be assessed against Ozman has not yet been determined, that determination will be made after the trial of the claims against the Bank.

Leave to withdraw, however, is conditioned on White & Case remaining Ozman's agent solely for the purpose of receiving papers in connection with this lawsuit. Since Ozman originally designated White & Case to be his counsel in this case, service of papers on White & Case will be deemed adequate and proper service on Ozman, until Ozman retains new counsel and new counsel appears on his behalf. The Court notes that White & Case has had communications recently with Ozman in Turkey and thus is able to communicate with him. White & Case is directed to promptly forward to Ozman in Turkey any papers it receives in this case on his behalf.

### 2. The Motions in Limine

The Bank seeks to exclude from trial (i) any evidence relating to the discharge or resignation of former employees of the Bank other than plaintiff and (ii) any evidence of discriminatory comments allegedly made by Ozman. Plaintiff cross-moves to exclude from trial (i) oral statements allegedly made by Ozman to Sadik Kutlu and/or others and (ii) a letter dated December 9, 1983 from Russell Reynolds Associates, Inc. to the Bank.

### A. The Bank's Motion

#### i. Evidence Relating To Other Employees

█ Plaintiff apparently proposes to testify at trial that six former employees of the Bank who were hired by Michael Baldwin, a former General Manager of the Bank's New York Branch, were discharged or forced to resign when Ozman became General Manager. This testimony will be excluded, however, because it is apparent that plaintiff lacks personal knowledge of the facts in question.

Under Rule 602 of the Federal Rules of Evidence, a witness may not testify to a matter unless he or she has personal knowledge thereof. See Folio Impressions, Inc. v. Byer California, 937 F.2d 759, 764 (2d Cir. 1991) (a witness has personal knowledge if he or she testifies from "general observation and knowledge, and not upon conjecture or hearsay"). The excerpts of plaintiff's deposition show that he lacks personal knowledge as to whether four of the six former employees in question were discharged or were forced to resign or left the Bank voluntarily. (See Marfia Dep. Tr. at 269–70, 272–73 (Diaz), 270–72 (Brieger), 267–69 (Tamberelli), 276–77 (Mangold)). At best, plaintiff's contention that these employees were fired or forced to resign is based on "conjecture or hearsay." Moreover, even assuming that plaintiff has some personal knowledge as to the voluntariness of the departures of Remigio and Taddeo, there is nothing in the record to show that plaintiff has any personal knowledge that age or national origin was a factor in their departures.

Indeed, the documentary evidence submitted by the Bank shows that Brieger resigned

---

1. White & Case has represented that it sent copies of its motion papers to Ozman. The Court has received no response to the motion from Ozman.

to accept an "attractive offer" from another bank, that Tamberelli resigned to pursue a career in computer marketing, and that Diaz resigned for unspecified reasons. In addition, the uncontroverted affidavit of Lois O'Wyatt, Senior Executive Secretary of the Bank, shows that five of the six employees in question were released or resigned while Baldwin—rather than Ozman—was General Manager. Hence, it appears that plaintiff is wrong in his beliefs that the six employees were fired or forced to resign because of the attitudes or biases of Ozman.

Significantly, plaintiff makes no effort in his memorandum of law in opposition to the motion in limine to show that he has any personal knowledge of the facts surrounding the departure of any of the six former employees in question. (*See* Pl. Mem. in Opp. to Def. Mot. in Limine at 17–18). Although plaintiff's counsel points out, in a letter submitted after the in limine motions were briefed, that plaintiff was a Senior Vice President of the Bank, plaintiff does not identify any specific facts relating to the departures of the six former employees as to which he has personal knowledge.

Accordingly, defendant's motion in limine is granted as to evidence relating to the departures of the six former employees in question.

### ii. *Ozman's Statements*

■ Plaintiff apparently proposes to testify as to certain discriminatory statements purportedly made by Ozman.[2] While disputing that the statements were made, the Bank argues that evidence of these statements should be excluded because the statements are not relevant and are highly prejudicial.

Rule 401 of the Federal Rules of Evidence broadly defines "[r]elevant evidence" to mean "evidence having *any* tendency to make the existence of any fact ... more probable or less probable than it would be without the evidence." (Emphasis added). Statements manifesting discriminatory attitudes on the part of employers surely are relevant to a claim of discrimination.[3] Even assuming, as the Bank alleges, that the ultimate decision to fire plaintiff was made in the Head Office, Ozman was certainly in a position to influence the Head Office's decision because he was the General Manager of the New York Branch "authorized and empowered in the name and on behalf of the Bank to execute, authorize, and conduct all business matters related to the operations of the New York Branch." His comments are relevant because they tend to show the existence of a discriminatory atmosphere at the Bank.[4]

---

**2.** These include, for example, Ozman's purported instructions to plaintiff to "Americanize" the clerical staff and his purported statements that he did not want "non-traditional Americans" in the top positions of the Bank and that the Bank was becoming a "Cosa Nostra" with so many Italians in managerial positions.

**3.** *Sweat v. Miller Brewing Co.,* 708 F.2d 655, 656–57 (11th Cir.1983) (evidence of stereotypical statements about women and older people generally raised issue of fact as to employer's intent); *Daniels v. Fowler,* 57 Fair Empl.Prac.Cas. (BNA) 65, 70, 1991 WL 332702 (N.D.Ga.1991), *aff'd,* 966 F.2d 681 (11th Cir.1992) (evidence of racial slurs, even if not made toward plaintiff, is relevant to "whether defendant's actions toward plaintiff stem from racially discriminatory patterns of thought"); *Nobler v. Beth Israel Medical Center,* 735 F.Supp. 65, 67 (S.D.N.Y.1990) ("age-related remarks by an employer which concern employment opportunities, such as promotion, have been held relevant and admissible, notwithstanding that such remarks were not specifically directed at ... plaintiff"); *Stewart v. Peat, Marwick, Mitchell & Co.,* 52 Fair.Empl.Prac.Cas. (BNA) 445, 451–52, 1989 WL 34037 (S.D.N.Y. 1989) (statement regarding "nigger jokes" re-

flected animus of employer and was evidence that "race made a difference in the employer's employment decision").

**4.** *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992) (plaintiff may present "evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude"); *Owens v. New York City Housing Authority,* 934 F.2d 405, 410 (2d Cir.), *cert. denied,* 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991) (offensive statements made by individuals with substantial influence over plaintiff's employment); *Crader v. Concordia College,* 724 F.Supp. 558, 564 (N.D.Ill.1989) (if decisionmaker's sources of information about plaintiff are "polluted by racial bias, that might be enough to poison the well"). *See also Conway v. Electro Switch Corp.,* 825 F.2d 593, 597 (1st Cir.1987) ("circumstantial evidence of a discriminatory atmosphere at a plaintiff's place of employment is relevant to the question of motive in considering a discrimination claim"); *Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1342 (1st Cir.1988) ("The inquiry into a corporation's motives need not be artificially limited to the partic-

Accordingly, the Bank's motion is denied as to the statements listed in paragraph 5 of Section B of the Corrected Consent Pretrial Order, except that the motion is granted as to paragraph 5(d) (plaintiff was told by Ozman to fire his African–American secretary) and 5(i) (Ozman told plaintiff never to go again to a restaurant where a gangland slaying had occurred and stating that he now knew why plaintiff ate there).

## B. Plaintiff's Cross–Motion

### i. Ozman's Statements

■ The Bank apparently proposes to elicit testimony from Sadik Kutlu, an officer of the Bank, that Ozman told him that plaintiff had exceeded his foreign exchange trading limits. Plaintiff argues that the proposed testimony should be excluded because it is "classic hearsay." The Bank counters that the proposed testimony is not hearsay because it is being offered not for the truth of the matters asserted but only to show the information upon which the Bank relied in making the decision to discharge plaintiff.

Even assuming arguendo that the proposed testimony is not hearsay, I will not allow it. As set forth in more detail in the discussion of the use of the default judgment below, it would be fundamentally unfair to permit the Bank to rely on statements purportedly made by Ozman when he refused to cooperate in discovery, was not available for a full deposition, and will not be available to be cross-examined at trial. Although it is true, as the Bank suggests, that the supervisor (Kutlu) who purportedly heard Ozman's statements will be available to be cross-examined, plaintiff still has lost the opportunity to impeach Kutlu by eliciting inconsistent statements from Ozman.[5]

While it may be appear inconsistent to permit plaintiff to testify as to statements purportedly made to him by Ozman while not permitting the Bank's witnesses to testify as to statements purportedly made to them by Ozman, that is the only fair result under the circumstances. If Ozman, who was the Bank's employee and the head of the New York Branch at the time, had not abused the discovery process, the parties would not be in their present predicament. The Bank will not be permitted to use the default of its own agent and employee to hinder plaintiff's ability to impeach the Bank's witnesses at trial.

Finally, it is worth noting that the Bank acknowledges that it has other proof that it intends to offer at trial to show that plaintiff exceeded bank trading limits. (Def. Mem. in Opp. to Pl. Cross–Motion in Limine at 4 n. 2). Hence, it will not be prejudiced in this respect. *See United States v. Weiss,* 930 F.2d 185, 198 (2d Cir.), *cert. denied,* 502 U.S. 842, 112 S.Ct. 133, 116 L.Ed.2d 100 (1991) (affirming exclusion of evidence that would have had "minimal probative value because it was cumulative").

Accordingly, this part of plaintiff's cross-motion in limine is granted, and at trial the Bank may not affirmatively present proof of statements purportedly made to its employees by Ozman.

### ii. The Letter

■ Finally, the Bank apparently proposes to offer at trial a letter dated December 9, 1983 from Russell Reynolds Associates, Inc. ("Russell Reynolds") to Michael Baldwin of the Bank. The letter provides information gathered by Russell Reynolds about plaintiff in 1983 when the Bank was considering whether to hire him. The letter purports to quote individuals at two Chicago banks and an investment bank who apparently knew plaintiff. One individual is quoted as saying that "Tony Marfia is someone you watch

ular officer who carried out the action."). *But see Haskell v. Kaman Corp.,* 743 F.2d 113, 120 (2d Cir.1984) (holding that comments relating to age, made some three to fifteen or more years prior to plaintiff's discharge, were not relevant to show that he was fired because of his age).

**5.** The Bank relies heavily on *Mazzella v. RCA Global Communications, Inc.,* 642 F.Supp. 1531 (S.D.N.Y.1986), for the proposition that a decisionmaker may testify, over a hearsay objection, to criticisms of the plaintiff made by co-employees, since the out-of-court statements are not offered to prove the truth of the criticisms but only that the decisionmaker received the criticisms. Significantly, the court in *Mazzella* noted that the plaintiff in that case was "free to subpoena [the co-employees] for trial." In the present case, plaintiff is not free to subpoena Ozman, nor did he have the opportunity to fully depose him.

closely," that Marfia had been fired from two jobs, and that he had taken a trading position that exceeded that bank's limits. The latter criticism is precisely the reason given by the Bank in the present case for discharging plaintiff.

Plaintiff seeks to exclude the letter as well as statements relating to the letter on the grounds of hearsay and prejudice. The Bank argues that Exhibit B is not being offered to prove the truth of the matters asserted therein, but simply to show the background information the Bank had about plaintiff when it was considering whether to discharge him.

Even assuming that Exhibit B is not hearsay, this aspect of plaintiff's cross-motion is granted, for I find pursuant to Rule 403 of the Federal Rules of Evidence that the probative value of Exhibit B is substantially outweighed by the danger of unfair prejudice and confusion. Exhibit B was prepared for the Bank in 1983—*before* plaintiff commenced his employment with the Bank. Moreover, the Bank hired plaintiff notwithstanding the negative statements in Exhibit B. Hence, Exhibit B's probative value to the Bank's decision to fire plaintiff in 1987 is slight.[6]

On the other hand, the danger of unfair prejudice or confusion if the evidence is received is great. Although a limiting instruction could be given, the jury will still have a difficult time distinguishing between considering the evidence for the Bank's state of mind and considering it for the issue of whether plaintiff actually exceeded trade limits. In view of the similarity between the conduct described in the letter and the conduct alleged by the Bank, the jury would be sorely tempted to consider the letter for the truth of the matters asserted therein. Moreover, it would be inherently unfair to plaintiff to allow into evidence what would otherwise amount to double hearsay that was some three-and-a-half years old when the Bank decided to fire plaintiff. *See, e.g., United States v. Hitt,* 981 F.2d 422, 424 (9th Cir. 1992) (where evidence is of "very slight (if

any) probative value," it is an abuse of discretion to admit it if there is "even a modest likelihood of unfair prejudice or a small risk of misleading the jury"); *Eng v. Scully,* 146 F.R.D. 74, 81 (S.D.N.Y.1993) (report dated five years prior to incident in question was excluded under Fed.R.Evid. 403).

### 3.  *Use of the Default*

■ On the basis of the default judgment against Ozman, plaintiff asks the Court to make findings of fact, based on Ozman's "admissions," which plaintiff then proposes would be read to the jury at trial of the claims against the Bank, with an instruction that the jury draw all reasonable inferences in favor of plaintiff. Plaintiff contends that, in light of the default judgment, the *sole* factual issue for trial on liability is the issue of respondeat superior, *i.e.,* whether the Bank is responsible for Ozman's actions. Plaintiff speculates that, in denying the summary judgment motion, Judge Duffy merely found that the default judgment did not establish the Bank's responsibility for Ozman's actions.

Relying heavily on Judge Duffy's statement that "[t]he default taken establishes nothing," the Bank argues that Judge Duffy has already ruled that the default judgment cannot be used against the Bank. In addition, the Bank argues that a default judgment, as a matter of law, has no effect on a co-defendant. Finally, arguing that it has been prejudiced by Ozman's actions, the Bank argues that the default judgment is not admissible because it is irrelevant hearsay. *But see Zaken v. Boerer,* 964 F.2d 1319, 1323 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 467, 121 L.Ed.2d 375 (1992) (holding that statements of a company vice president were admissible against the principal owner of the company under Fed.R.Evid. 801(d)(2)(D) as an admission made by "the party's agent or servant concerning a matter within the scope of the agency or employment").

---

**6.** It should be noted that the Bank does not allege that it *actually* relied on Exhibit B in making its decision to fire plaintiff in 1987. (*See*

Def. Mem. in Opp. to Pl. Cross–Mot. in Limine at 7–8).

As an initial matter, it is not productive to speculate as to precisely what Judge Duffy had in mind when he denied plaintiff's summary judgment motion, although it is clear that he thought the matter should go to trial. I believe the right and fair result is somewhere in between the two positions taken by the parties.

The default judgment does not, by itself, establish that the Bank discriminated against plaintiff. It certainly is possible that, notwithstanding the comments purportedly made by Ozman to plaintiff, a reasonable jury could find that plaintiff was discharged by the Head Office for improper trades. On the other hand, because the default judgment was entered against Ozman in both his individual and *official* capacities, and given the inherent unfairness created by Ozman's discovery abuses, plaintiff should be able to make some use of the default judgment (or the admissions arising therefrom) at trial.

The Bank cites a number of decisions that hold that a default judgment against one defendant does not prevent a codefendant from contesting the plaintiff's claim. *See, e.g., Pfanenstiel Architects, Inc. v. Chouteau Petroleum Co.,* 978 F.2d 430, 431 (8th Cir. 1992); *Rhodes v. Meyer,* 334 F.2d 709 (8th Cir.), *cert. denied,* 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186 (1964); *State Farm Mut. Auto. Ins. Co. v. Jackson,* 736 F.Supp. 958, 960 (S.D.Ind.1990); *Benoay v. Decker,* 517 F.Supp. 490, 496 (E.D.Mich.1981), *aff'd,* 735 F.2d 1363 (6th Cir.1984). None of those cases, however, involved a situation where, as here, the defaulting defendant was an employee of the nondefaulting defendant, and the default was taken against the defaulting defendant in his individual and *official* capacity.

For example, in *State Farm,* an insurance company brought a declaratory judgment action against the driver of the insured automobile as well as a passenger in a second automobile who was injured in the accident. The insurance company sought a declaration that the accident was not covered by the policy. The driver failed to answer the complaint, and a default judgment was entered against him. The insurance company then moved for summary judgment against the passenger,

arguing that the driver's default resulted in admissions of the allegations of the complaint, which admissions could be used against the passenger. The court denied the motion, holding that the default against the driver could not be used against the passenger. The court noted that because the passenger's rights were "not derivative of the rights of the defaulter," the default could not determine the passenger's rights and it could not preclude the passenger from "fully litigating all of the issues and defenses." 736 F.Supp. at 960.

The Bank cites *Rhodes v. Meyer,* 334 F.2d 709 (8th Cir.), *cert. denied,* 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186 (1964), as a case where a default judgment against an "agent" was not permitted to be used against a "principal." While that technically was one of the results, in fact, the case does not stand for that proposition. There, the plaintiff, an inmate, had obtained a default judgment in a *prior* lawsuit against a penitentiary guard. He then relied on the default judgment in a subsequent civil rights case that alleged a conspiracy among the defendants, who consisted of state supreme court justices, state district judges, prosecuting attorneys, clerks of court, sheriffs, law enforcement officers, prison officials and members of the bar. 334 F.2d at 711.

The Court of Appeals noted simply that the default judgment was not part of the record before it and that "nothing" in the prior case had any "persuasive effect" on the issues it was considering. *Id.* at 718. The case hardly provides support for the proposition that a default judgment against a co-defendant employee, who was acting within the scope of his employment when the default was committed, may not be used against the co-defendant employer.

Agency principles provide support for permitting plaintiff to make some use at trial of the default judgment against Ozman. Under agency law, it is fundamental that "a principal is liable for all obligations incurred by his agent within the course of his employment." 3 N.Y.Jur.2d, *Agency* § 239 at 64 (1980). Even when an agent is guilty of misconduct, if that misconduct occurred in the course of the agent's employment, the

principal must answer for the acts of misconduct whether he authorized them or not. *Id.,* § 244 at 69. *See generally Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 578–79 (2d Cir.1989) (discussing agency principles in Title VII context); *Citibank, N.A. v. Nyland (CF8) Ltd.,* 878 F.2d 620, 624 (2d Cir.1989) ("a principal is liable to third parties for the acts [including fraud] of an agent operating within the scope of his real or apparent authority").

These principles are based on the reasoning that a third party who is injured by the actions of an agent should have recourse against the principal who placed the agent in a position to inflict the injury and who held the agent out as someone competent and fit to be trusted. 3 N.Y.Jur.2d, *Agency* § 240 at 66 (1980).

There is no reason why, as a theoretical matter, these agency principles should not be applied to an agent's actions in the context of a litigation. Here, Ozman's misconduct occurred in the course of his employment; it was certainly part of his duties as General Manager of the New York Branch to participate and assist in the defense of this lawsuit. The Bank put him in charge of the New York Branch, held him out as a person who was competent and fit to run the New York Office, and put him in a position where it was his responsibility to participate in the lawsuit. Accordingly, the Bank must answer for Ozman's acts of misconduct committed during the course of his participation in the defense of this lawsuit.

Significantly, Judge Duffy recognized that Ozman's actions that led to his default were within the scope of his employment, as the default judgment was entered against Ozman in both his individual capacity and in his official capacity as general manager of the New York Branch.

While it is true, as the Bank contends, that Ozman has put the Bank in a difficult position, Ozman has also severely prejudiced plaintiff. As plaintiff's immediate supervisor and as the head of the New York Branch, Ozman certainly had extensive knowledge of the events in issue. Yet, plaintiff was unable to fully depose him, and he is not available to be called at trial. Moreover, Ozman destroyed at least one document that might have been helpful to plaintiff's case. Judge Duffy found that his conduct was so egregious that it warranted the sanction of a default judgment. That default judgment may be rendered meaningless if plaintiff is not able to make some use of the default judgment at trial, for any monetary judgment against Ozman is likely to be uncollectible, as he has returned to Turkey.

Accordingly, plaintiff will be permitted to make use of the default judgment at trial to the following extent:

1. The jury will be instructed that Ozman was named as a defendant in this lawsuit, that he initially appeared and defended the lawsuit, represented along with the Bank by White & Case, that he thereafter defaulted on his obligations in the lawsuit, that thereafter his employment was terminated and he returned to Turkey, that he no longer is a party to the lawsuit, and that White & Case no longer represents him;

2. The jury will be further instructed that as a consequence of his default, Ozman is deemed to have admitted the following allegations, which were contained in the complaint, which will be referred to as "Ozman's Admissions":

a. In or about August 1984, plaintiff was given the responsibility of managing the Treasury Department of the New York Branch, in addition to the management of the Correspondent Banking and Marketing operations of the New York Branch (Complaint ¶ 10);

b. In or about August 1985, plaintiff was given the additional responsibility of managing the Credit Operations of the New York Branch (*id.* ¶ 11);

c. In or about October 1985 plaintiff was given the additional responsibility of managing the daily operations of the New York Branch (*id.* at ¶ 12);

d. In or about July 1986, plaintiff was promoted to Senior Vice President (*id.* ¶ 13);

e. Throughout his tenure at the Bank, plaintiff performed his assigned duties as Vice President and subsequently as

Senior Vice President of the Bank in an efficient and competent manner (*id.* ¶ 20);

f. Throughout his tenure with the Bank, plaintiff's actions in his capacity as Treasurer of the Bank were made with the knowledge of his superiors, who were made aware of plaintiff's actions, in his official capacity, within a week of their occurrence (*id.* ¶¶ 27, 28);

g. During his tenure, plaintiff facilitated the Bank's ability to maintain a profitable international banking presence in New York City with a respectable and commendable reputation (*id.* ¶ 28);

h. The job description for employment as Treasurer for the Bank and the nature of that employment included engaging in speculative investment and trading (*id.* ¶¶ 29, 30);

i. Over the course of his tenure with the Bank, plaintiff engaged in such speculative investment and trading in such a manner that his actions were profitable for the Bank and he earned, in his official capacity, profits for the Bank of more than $3 million (*id.* ¶¶ 31, 32).

j. Such earnings were exemplary and given the capital assets that plaintiff had to invest, he earned greater profits proportionally than most other bank treasurers during this same period (*id.* ¶ 33);

k. At the time of his discharge, plaintiff's salary was higher than the salary of the man who replaced him (*id.* ¶ 39);

*l.* In June 1986, plaintiff was offered an employment contract with a private bank, iKTiSAT BANKASI, in Istanbul, Turkey to fill the position of Treasurer (*id.* ¶ 51);

m. This job offer was discussed directly with Ozman and on or about July 1, 1986 plaintiff submitted a resignation letter to Ozman in order to accept this offer (*id.* ¶ 52);

n. Upon reading this letter of resignation, Ozman stated to plaintiff that he would not accept his tendered resignation (*id.* ¶ 53);

*o.* Following plaintiff's tender of this resignation letter, Ozman reiterated and formalized an offer to plaintiff that he would be working for the Bank for the rest of his professional life; Ozman, acting on behalf of the Bank, made these promises of lifetime employment for the purpose of inducing plaintiff not to accept this other Turkish bank's job offer and for inducing him to retain his position with the Bank (*id.* ¶ 54);

p. In reliance upon Ozman's offers and promises, plaintiff turned down the job offer from the other Turkish bank and arranged to reunite his family by having his son, who was living in Europe at the time, come to the United States and live in Connecticut (*id.* ¶ 55);

q. In August and September 1986, plaintiff had two meetings in New York City with the general manager and chairman, respectively, of the other Turkish bank wherein the terms of the employment offer to plaintiff were made more attractive, i.e., salary raise, longer duration of contract (*id.* ¶ 56);

r. Ozman, as an agent of the Bank, made representations to plaintiff concerning the Bank's intention to maintain an employment relationship with plaintiff for the duration of his professional life (*id.* ¶ 61);

s. At the time Ozman made the representations of employment for plaintiff's professional life, Ozman knew these representations to be false, and he made them with the intention that this information would induce plaintiff to give up his other job offer and retain his position with the Bank; plaintiff did not discover the falsity of Ozman's representations until after he had relied on these representations to his detriment (*id.* ¶ 62);

t. Plaintiff developed expertise in the banking field which included the overall management of the banking functions in the areas of treasury, correspondent banking, marketing, credit, operations, and personnel; plaintiff maintained a good reputation in said fields (*id.* ¶ 76); and

u. Following Ozman's representation of lifetime employment, plaintiff did not

seek new employment until after he was fired by the Bank (*id.* ¶ 81).

3. The Ozman Admissions may be read to the jury by plaintiff (or his counsel) at an appropriate time during the presentation of plaintiff's case;

4. The jury will further be instructed that Ozman's Admissions are to be considered as evidence in the case along with all of the other evidence, that the jury is to give Ozman's Admissions as much weight, if any, as it deems appropriate in considering plaintiff's claims against the Bank, and that plaintiff still must prove its claims against the Bank by a preponderance of the evidence;

5. While the Bank will be permitted at trial to impeach Ozman's Admissions and to rebut plaintiff's claims, it will not be permitted to raise the collateral issues referred to in its rebuttal memorandum (e.g., Ozman's medical condition, Ozman's lawsuits, etc.); Ozman's medical condition and his reasons for not complying with Judge Duffy's discovery orders were brought to Judge Duffy's attention and he nevertheless entered the default judgment; it is too late to attack the default judgment now.

In sum, at trial plaintiff will be able to use the Ozman Admissions as evidence to support his claims against the Bank, the Bank may try to attack that evidence (but not the underlying default judgment), and the jury will be instructed to give the Ozman Admissions as much weight as it deems appropriate.

### Conclusion

White & Case's motion for leave to withdraw as counsel for Ozman is granted, on the condition that it continue to accept papers on his behalf for transmittal to him and that service of papers on White & Case shall constitute good and sufficient service on Ozman (for purposes of this lawsuit).

The Bank's motion is granted as to evidence relating to the discharge or resignation of former employees of the Bank other than plaintiff and denied as to the discriminatory comments allegedly made by Ozman (with the two exceptions set forth above).

Plaintiff's cross-motion is granted.

Plaintiff's application with respect to the use of the default judgment is granted to the extent set forth above.

Trial will commence on Wednesday, February 1, 1995.

SO ORDERED.